Geiger, J.
The plaintiff in error was tried in the police court of the city of Springfield, and convicted of the violation of Section 12720, G. 0., which provides in substance that whoever sells or has in his possession with intent to sell, milk from which the cream or part thereof has been removed, unless in a conspicuous place upon the outside of each vessel in which the milk is sold, the words “skimmed milk” are distinctly marked in uncondensed Gothic letters, not less than one inch in length, shall be fined not less than $50 nor more than $200.
The plaintiff prosecutes error, alleging seven different grounds on which he claims the court below has committed error, among them being that the judgment of the court is not sustained by sufficient evidence, and is contrary to law.
Testimony was introduced in the court below tending to show that the plaintiff in error, Mr. Bitner, was the general manager of the Springfield Dairy Products Company; that at the Pure Milk branch of said company, located on North Fountain avenue, on the morning of the 12th of June, four samples of milk were secured; that one sample was taken from a ten gallon can containing producers milk, which was being poured by an employee of the company into the weighing vat, which vat had a capacity of about fifty gallons. At the same time a sample was secured from another can, designated by the witness as containing skimmed milk, from which can milk was being poured into the same weighing vat into which the producers’ milk was being poured. From the weighing vat containing 50 gallons, the milk passed into an agitating vat containing about 500 gallons. As the milk passed from the weighing vat into the agitating vat, a third sample was secured. The milk from the agitating vat passed into pipes and down onto the lower floor where it passed through several other vats designated as the heating vat, the clarifier and pastuerizer, from whence it went into the bottle filler.
The fourth sample was taken from the filled bottle, capped and about to be placed in the ice chest where it was cooled preparatory to delivery.
*296 The four samples so taken were delivered to the state chemist, who made an examination of the same, testifying that he tested the samples by two methods," one known as the Reese-Gotlieb method, and one as the Babcock method.
These tests disclosed the fact that sample No. 1, taken from the producers’ can, had a butter fat content of 8.3 per cent.; that sample No. 2 taken from the can being poured into the weighing vat together with the producers’ milk, contained 2/10 of one per cent, of butter fat; that sample No. 3 taken at the point where the milk leaves the weighing vat, contained 3.5 per cent butter fat, and that sample No. 4 taken from the filled bottle near the ice-box, contained 3.45 per cent of butter fat. Butter fat is cream.
These per cents were obtained by the Babcock test. The per cents obtained by the Reese-Gotlieb method -disclosed a slightly different' per cent, of butter fat content in all four of the samples.
It appears from the evidence that the bottle into which the milk flowed from the bottling machine, and in which it was to be sold, was not in any way marked as containing skimmed milk.
The Springfield Dairy Products Company has a large number of delivery wagons, from which they daily distribute an average of more than 10,000 bottles of milk and cream to the citizens of Springfield, bottled at this plant.
Much testimony was submitted covering the methods in vogue in various milk distributing plants, including that conducted under the direction of the Ohio State University.
The defendant did not go upon the stand, and no testimony was introduced on behalf of the defendant directly admitting that the milk sold by his company was brought to a fixed standard of butter fat content by the admixture of skimmed milk; neither was any testimony introduced by the defendant directly denying this to be the fact.
Much evidence was introduced by which it is attempted to be shown that milk of a fixed daily standard of butter fat content is more beneficial to the consumer than milk which might vary from day to day, depending upon the richness of the milk deliv *297 ered by tbe producers, and it was testified that the milk given by various herds or individual animals might vary from day to day, depending upon many things, such as the breed of the herd, the condition of the weather, and the character of the food.
It is admitted that milk delivered by the producers was paid for in accordance with its butter fat content, and that the money value .of milk depended upon this.
Several methods of standardizing milk to a fixed butter fat content were described, one of which is to mix the whole milk from different producers furnishing milk of a varying degree of butter fat, so as to raise that containing a low per cent., and reduce that containing a high per cent. Another method is to extract skimmed milk from whole milk of a low percent, of butter fat, or add it to that having a high per cent. Milk containing a low per cent, of butter fat may also be enriched by adding cream so as to bring the milk to a given standard.
No evidence, however, appears from which it can be gleaned that any of the products of the Springfield Dairy Products Company were enriched above their natural state by the addition of cream or the extraction of skimmed milk.
However, it does appear that the method pursued by this company was to add milk from which practically all butter fat had been extracted and which was as near skimmed milk as machinery could make it, to the whole milk as delivered by the producers, so as to reduce the butter fat content from that of the whole milk to a fixed standard of about three and one-half (3Vo) per cent.
The statutes of Ohio provide that if milk is shown, upon analysis, to contain less than three per cent, of fats, it shall be deemed to be adulterated. The evidence shows that the milk sold by the company contained more than three per cent, of butter fat, to-wit, about 3.5 per cent.
The defendant below not admitting that this method of mixing skimmed milk with whole milk prevailed at the plant of which he was the general manager, sought to show that this was the general method of standardizing milk practiced throughout the state of Ohio, and taught at the Ohio State University, and practiced by the dairy under the control of the University.
*298 It is sought to be shown that milk of 3.5 per cent, butter fat is the most wholesome for children, and that a higher per cent, of butter fat, especially if the same varied from day to day, would be highly deleterious to the infant consumer.
The first question to be determined by the reviewing court is whether or not the verdict of the court below is against the manifest weight of the evidence.
This court is quite satisfied that the trial court was correct in so far as it may have found that the defendant below was the manager of the company which had in its custody, with intent to sell, milk which was brought to a fixed standard of butter fat content by the admixture to the whole milk delivered by the producers, of skimmed milk, so as to reduce the per cent, of butter fat content.
The court is more ready to arrive at this conclusion from the fact that the defendant himself did not go upon the stand, and that no attempt was made, except by inference, to deny the existence of this process, which was directly testified to by the witnesses for the state.
Upon this state of facts various legal contentions are based. First, it is urged there is no evidence that the defendant. Mr. Bitner, was guilty of the act charged; but it appears in evidence that he was the general manager of the company, and as such had direction and control of the production and distribution of the milk.
The offense charged against the defendant is a misdemeanor. In misdemeanors all are principals, and though the milk may have been kept for sale by the corporation and distributed by the agents of the corporation other than the defendant, all those who are connected .with the custody or possession of the milk, with intent to sell, would be liable to the penalty of the statute. Miller v. The Stale, Ohio Law Rept., October 13, 1919, page 106; Williams v. The State, 4 C. C. (N. S.), 193; Myer v. The State, 54 O. S., 242; State v. Kelly, 54 O. S., 166; State ex rel v. Capitol City Dairy Company, 62 O. S., 350.
The original act (86 O. L., 229), of which the present statute is an amendment, provided, “no dealer in milk, and no servant *299 or agent of such dealer, shall sell,” etc. The present statute provides, “Whoever sells,” etc. The amendment does not narrow the original in respect to those who shall be guilty. The principal and all servants and agents may be alike guilty.
The main defense is upon the construction to be placed upon the various sections of the statutes in reference to the selling of milk and its products — Sections 12716 to 12727, G. C.
Section 12716 provides that in all prosecutions under the chapter, if milk is shown, upon analysis to contain less than three per cent, fats it shall be deemed to be adulterated.
Section 12719 provides that whoever sells, or has in his possession with intent to sell as pure milk, any milk from which the cream or any part thereof has been removed, shall be punished.
Section 12720 provides that whoever sells or has in his custody with intent to sell, milk from which the cream or any part thereof has been removed, unless in a conspicuous place upon the vessel containing such milk, there is displayed the words “skimmed milk,” shall be punished.
Counsel for defendant take the position that the statutes should be read together, and that no prosecution can be had under the statute in reference to the sale of milk for deficiency of butter fat, if the milk sold contains more than three per cent, of fats, as provided in Section 12716.
On the other hand, it is urged by the state that Section 12716 stands alone, and provides what shall be deemed to be adulterated milk. If the milk, among other defects enumerated by the statute, contains less than three per cent, of fat, it shall be deemed to be adulterated. As to what is adulterated milk, see State v. Smith, 69 O. S., 196.
It is urged by the state that this section of the statutes, which penalizes the sale of “milk from which the cream or a part thereof has been removed,” makes it unlawful to sell any such milk as pure milk, or without labeling the container with the words ‘ ‘ skimmed milk, ’ ’, even though such milk may contain a butter fat of more than three per cent.
It is admitted by the state that whole milk of varying degrees *300 of richness of butter fat may be mixed so that the product may be less rich than that having the highest degree, and richer than that having the lowest, but it is insisted it is an offense to extract from any of the whole milk any cream, and sell the resulting product either as pure milk, or without the designation, “skimmed milk.”
The court is of the opinion that these sections are independent of each other; one defining adulterated milk, with the appropriate penalty; another providing for a penalty for selling as pure milk that from which the cream or any part thereof has been removed, and one providing a penalty for selling milk from which the cream or any part has been removed without the proper designation.
Adulterated milk and skimmed milk are not the same. The statute arbitrarily defines adulterated milk as that having less than three per cent, of butter fat, irrespective of how such deficiency occurred, whether by the thinness of the original milk, the removal of the cream, or the addition of water.
To designate a milk as adulterated brands it as- of much lower food value than skimmed milk, in the consideration of the public. The Supreme Court has sustained the validity of this definition in State v. Smith, supra.
The court is convinced that the state has the power to designate as skimmed milk that from which the cream or any part thereof has been removed, and to require the seller to designate such as skimmed milk.
The fact that the product from which some of the cream has been removed, has still enough -cream remaining to prevent it being branded as adulterated milk, the sale of which is forbidden, does not permit its sale either as pure milk, or without the designation “skimmed milk.”
The court does not hold that milk containing less than three per cent, butter fat may not be sold under certain conditions; that question is not now before the court.
It appears to the court that there is much value in these statutes defining different qualities of 'milk and preventing their sale except under certain restrictions. There is no prod- *301 net that is more important for human consumption, and no product in the sale of which more care should be observed and honesty practiced.
It is quite easy to deceive the consumer by tampering with the natural product, so as to render it less valuable as a food.
If the contention of the plaintiff in error is correct, the public at no time would reap any benefit from the efforts of dairymen to produce a high grade milk, with a high per cent, of butter fat, as the consumer would always be limited to the enjoyment of that which in richness just escapes being branded as adulterated milk.
It is claimed on behalf of plaintiff in error that to deny the right to distributors to standardize milk, would be to render it impossible to carry on a large enterprise such as that conducted by this company, and that the public would suffer in consequence.
The public is more largely concerned in receiving milk which is in fact pure, and from which no cream has been removed, than it is in the success of a -large business, which through successive years has acquired more and more a monopolistic control of the milk distribution in this city.
The public is not so much concerned in the high-sounding processes of “pasteurization,” “clarification,” “standardization” and “certification,” as it is in receiving the pure wholesome product of the herds.
Counsel for plaintiff in error insist that to brand their standardized product as “skimmed milk,” would be unconstitutional as destroying their property without due process of law, stating that to compel them to designate this milk “skimmed milk,” would be to destroy a large part of its value, and take away the right of private contract to deal with a legitimate and harmless article of commerce.
It is too late to argue that the state has not the constitutional power to control the quality of the food distributed to the citizens. See State ex rel v. Capitol City Dairy Company, 62 O. S., 350; affirmed by the U. S. Supreme Court.
It is claimed further that these statutes are unreasonable and oppressive, and that during the thirty years since their passage, *302 no court has ever been called upon to eniorce them. This maybe true, but does not prove that they are not wholesome and constitutional provisions for the protection of the public.
The public has the right, under this statute, to receive the natural milk, undiluted, either by the addition of water, or the subtraction of cream, and neither the high-sounding phrases nor opinions of experts can deprive them of this right.
If the plaintiff in error desires to take from the natural milk, cream, so it may derive an additional revenue from selling it as cream and double cream, the public has the right to be informed that the product it receives is such that the state requires it to be branded as “skimmed milk.”
The argument that the company will be deprived of a valuable property right by requiring it to label its product-“skimmed milk, ’ ’ does not have weight with the court, in that the company can easily avoid this by selling the milk in its original purity and foregoing the extra profit that arises from selling a portion of it at high rates as créam and double cream.
Petition in error dismissed, and cause remanded for execution.